**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LUIS BELTRAN,<br><br>                Plaintiff,<br><br>     v.<br><br>2 DEER PARK DRIVE OPERATIONS LLC, et al.,<br><br>                Defendants. | Civil Action No. 20-8454 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants 2 Deer Park Drive Operations LLC d/b/a Park Place Center ("Park Place") and Genesis Healthcare LLC's (collectively, "Defendants") Motion to Partially Dismiss Plaintiff Luis Beltran's ("Plaintiff") Complaint. (ECF No. 4.) Plaintiff opposed (ECF No. 6), and Defendants replied (ECF No. 7). The parties also submitted Supplemental Briefs. (ECF Nos. 10, 11.) The Court has carefully considered the Parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Defendants' Motion is granted in part and denied in part.

### I.    BACKGROUND[1]

#### A.    Plaintiff's Employment

This action involves allegations of an unlawful COVID-19-related termination of employment. Plaintiff worked as a full-time maintenance building technician at Park Place, a

---

[1] For the purposes of a motion to dismiss, the Court accepts as true and summarizes the factual allegations of the Complaint. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

nursing home in Monmouth Junction, New Jersey. (Compl. ¶ 6, Ex. A to Notice of Removal, ECF No. 1.)

On March 24, 2020, Plaintiff and his supervisor, David Santos ("Santos"), "performed work in the room of a resident who later tested positive for COVID-19." (*Id.* ¶ 10.) Plaintiff learned of the resident's test results at a meeting held on March 27, 2020. (*Id.* ¶ 11.) After inquiring whether he "needed to get tested based upon [his] exposure," the facility administrator advised that Plaintiff "did not need testing if [he was] asymptomatic." (*Id.* ¶¶ 12–13.) Over the ensuing weekend, Plaintiff began experiencing weakness and a sore throat. (*Id.* ¶ 14.) Consequently, Plaintiff called out sick on March 30, 2020. (*Id.* ¶ 15.) That same day, a Human Resources representative directed Plaintiff to submit supporting medical documentation. (*Id.* ¶ 17.)

Over the next three days, Plaintiff contacted his primary care physician's office and was advised each time "they would get back to him." (*Id.* ¶¶ 19–21.) Plaintiff also "contacted an urgent care facility," which declined "to see Plaintiff based upon his symptomology." (*Id.* ¶ 22.) Plaintiff then contacted "Santos and human resources to explain his situation." (*Id.* ¶ 23.) On April 2, 2020, "Santos contacted Plaintiff and advised that if he was asymptomatic he could return to work." (*Id.* ¶ 24.) That evening, Plaintiff learned that his mother had been hospitalized. (*Id.* ¶ 25.) Plaintiff's mother typically took care of Plaintiff's children while he worked. (*Id.*) The next day, Plaintiff "called out of work due to the health of his mother and the need to care for his kids." (*Id.* ¶ 26.)

On April 6, 2020, a Hamilton Township Division of Health ("Hamilton DOH") representative informed Plaintiff that "his mother had tested positive for COVID-19 and [that] Plaintiff needed to quarantine for two weeks." (*Id.* ¶ 28.) The Hamilton DOH representative also "advised that she would contact Plaintiff's employer." (*Id.* ¶ 29.) The record contains a corresponding document issued by the Hamilton DOH, titled "Agreement for Active Monitoring—

2

Quarantine Required," ("Hamilton DOH Quarantine Order"), that indicates the DOH instructed Plaintiff to quarantine from April 2 to April 16, 2020.[2] (DOH Quarantine Order *16–17,[3] Ex. B to Silverman Certif., ECF No. 6-1.) That document states, in relevant part:

> 3. You are being placed in quarantine for 14 days from your last exposure. Quarantine in general means separation of a person or group of people reasonably believed to have been exposed to a communicable disease but not yet symptomatic, from others who have not been exposed, to prevent the possible spread of the communicable disease.
>
> a. this means that you are not allowed to go beyond the quarantine premises, and you shouldn't have contact with any person(s) not subject to quarantine other than a physician, other health care providers, or persons authorized to enter the quarantine premises as indicated by public health officials.

(*Id.* at *16.) Thereafter, Plaintiff contacted "Santos and explained the situation, including the need for quarantine." (Compl. ¶ 30.) Santos nevertheless "advised that Plaintiff was still required to report to work." (*Id.* ¶ 31.) After contacting Santos again, Santos informed Plaintiff that he "could stay out until April 13, 2020." (*Id.* ¶ 32.)

On April 9, 2020, Defendants informed Plaintiff via correspondence that his employment would be terminated if he did not report to work on April 13, 2020. (*Id.* ¶ 33.) Plaintiff did not report to work on April 13, 2020, and Defendants terminated his employment that same day. (*Id.* ¶¶ 6, 34.)

---

[2] Although generally "a district court ruling on a motion to dismiss may not consider matters extraneous to pleadings," a "document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (alteration in original) (citations omitted).

[3] Page numbers preceded by an asterisk refer to the page number of the ECF header.

3

### B. Procedural History

On May 29, 2020, Plaintiff filed the instant seven-count action against Defendants in the Superior Court of New Jersey, asserting claims under: (1) the New Jersey Law Against Discrimination ("NJLAD"); (2) the New Jersey Earned Sick Leave Law ("ESLL"); (3) the New Jersey Conscientious Employee Protection Act ("CEPA"); (4) a common law theory of wrongful discharge in violation of public policy; (5) the Family and Medical Leave Act ("FMLA"); and (6) the Families First Coronavirus Response Act ("FFCRA"). (*Id.* ¶¶ 46–57.) Count Seven sets forth Plaintiff's requested relief in this matter. (*Id.* ¶¶ 58–66.)

On July 8, 2020, Defendants removed the matter to this Court. (*See generally* Notice of Removal.) On July 29, 2020, Defendants moved to dismiss Counts One through Four, Six, and Seven. (ECF No. 4.) Plaintiff opposed (ECF No. 6), and Defendants replied (ECF No. 7). On September 25, 2020, Plaintiff requested leave to file a supplemental brief addressing the Department of Labor's revised definition of "healthcare provider" under the FFCRA, which the Court granted. (ECF Nos. 8, 9.) Plaintiff filed the Supplemental Brief (ECF No. 10), and Defendants responded (ECF No. 11).

## II. LEGAL STANDARD

Rule 8(a)(2)[4] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir.

---

[4] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

4

2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 678). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a motion to dismiss for failure to state, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

## III. DISCUSSION

### A. Count One: NJLAD

Defendants argue that Count One "fails to state a claim because[] Plaintiff does not identify the disability that he believes Defendants perceived him as having or that any action taken towards [Plaintiff] was the result of a perceived disability." (Defs.' Moving Br. 15, ECF No. 4-1.) Defendants contend that "Plaintiff's claim of perceived disability is belied by him pleading that Defendant[s] repeatedly asked him to return to work." (*Id.*)

"The NJLAD prohibits employment discrimination on the basis of a disability." *Rich v. New Jersey*, 294 F. Supp. 3d 266, 278 (D.N.J. 2018) (citing *Victor v. New Jersey*, 4 A.3d 126, 141 (N.J. 2010)). "New Jersey courts have long recognized a discrimination claim for those who are

5

not disabled but are perceived to be disabled under the NJLAD." *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 535 (D.N.J. 2008) (citations omitted). To state a claim under the NJLAD, a plaintiff must allege that: "(1) he or she has a disability or is perceived by the employer as disabled; (2) he or she was qualified for the position from which he or she was discharged; (3) he or she has suffered an adverse employment action because of that disability; and (4) the employer sought someone else to do the same work." *Id.* at 534–35. Courts have rejected allegations of perceived disability where an employer requests that the employee return to work. *See Hilinski v. Potter*, No. 03-3549, 2006 WL 2569214, at * 16 (D.N.J. Sept. 1, 2006) (collecting cases).

Here, Plaintiff fails to sufficiently plead a claim under the NJLAD. As to prong one, Plaintiff alleges that Defendants perceived him to be disabled based upon Defendants' request that Plaintiff obtain supporting medical documentation when he called out sick. (Compl. ¶¶ 17–18.) Aside from not identifying a recognized disability under the NJLAD, the Complaint indicates that Defendants instructed Plaintiff to return to work on at least two separate occasions. (*Id.* ¶¶ 31, 33.) As noted above, however, courts have rejected allegations of perceived disability where, as here, an employer instructed an employee to return to work. *See, e.g., Gaul v. AT&T, Inc.*, 955 F. Supp. 346, 351 (D.N.J. 1997) (finding that an employer did not perceive an employee to be disabled where the employee "was called back from disability leave to work on a special project"). In his Opposition Brief, Plaintiff does not address the Complaint's assertions that Defendants directed Plaintiff to return to work. The Court, therefore, finds that Plaintiff fails to satisfy prong one. The Court also finds that Plaintiff fails to satisfy prong four because the Complaint does not suggest that Defendants either sought or hired another individual to replace Plaintiff's position. The Court, accordingly, grants Defendants' Motion to Dismiss Plaintiff's NJLAD claim.

### B. Count Two: ESLL

The ESLL prohibits employers from taking retaliatory action or discriminating against an employee who "requests or uses earned sick leave." N.J. Stat. Ann. § 34:11D-4. Here, Plaintiff alleges that his absences were protected under the ESLL. (Compl. ¶¶ 15–16, 26–27.) Plaintiff also alleges that, in terminating his employment, Defendants discriminated against him "for having exercised leave under the ESLL" and sought "to interfere with [his] leave under the ESLL." (Compl. ¶¶ 38–39.)

Defendants argue that "[t]he ESLL does not apply . . . because Plaintiff was a member of 1199 SEIU United Healthcare Workers East, New Jersey Region ('Union') and the Union waived its members' rights under the ESLL." (Defs.' Moving Br. 16.) In addition, Defendants submit a document titled "Memorandum of Agreement" ("MOA") that seemingly memorializes the Union's waiver of "all rights under the [ESLL]." (May 2019 MOA *18, Ex. B to Berk Certif., ECF No. 4-2.) The Complaint, however, is silent on this matter. It is also unclear from the record, and Defendants do not indicate, whether the MOA is a matter of public record that may properly be considered on a motion to dismiss. *See Marks v. Struble*, 347 F. Supp. 2d 136, 143 (D.N.J. 2004) (on a motion to dismiss, courts "generally only consider the allegations in the complaint, exhibits attached to the complaint, and public records."). At this juncture, therefore, the Court cannot consider Defendants' proffered waiver argument and will tentatively permit Plaintiff's ESLL claim to proceed. The Court, accordingly, denies Defendants' Motion to Dismiss Plaintiff's ESLL claim.

### C. Count Three: CEPA

Defendants argue that "Plaintiff's CEPA claim should be dismissed because it only concerns a private harm to [Plaintiff] and does not concern conduct that could be considered unlawful or indisputably dangerous to the public health, safety, or welfare." (Defs.' Moving Br.

8.) According to Defendants, "Park Place's request that Plaintiff return to work cannot be considered unlawful or dangerous because[] the [New Jersey Department of Health ('NJDOH')] expressly authorized healthcare facilities, such as Defendants, to decide whether asymptomatic employees who were exposed to COVID-19 should continue to work." (*Id.*)

"The purpose of CEPA is to provide protection 'to vulnerable employees who have the courage to speak out against or decline to participate in an employer's actions that are contrary to public policy mandates.'" *Stapleton v. DSW, Inc.*, 931 F. Supp. 2d 635, 638 (D.N.J. 2013) (quoting *Yurick v. State*, 875 A.2d 898, 77 (N.J. 2005)). "Since CEPA is a 'broad, remedial legislation,' it must therefore 'be construed liberally' to effectuate its important social goal." *Id.* (quoting *D'Annunzio v. Prudential Ins. Co.*, 927 A.2d 113, 119 (N.J. 2007)).

CEPA prohibits employers from taking retaliatory action against employees who engage in certain protected "whistle-blowing" activity, including objecting to, or refusing to participate in, employer activities that the employee reasonably believes is in violation of a law, rule, regulation or a clear mandate of public policy. *Id.* (citing N.J. Stat. Ann. § 34:19-3c). "[I]n order to be protected against retaliatory action by his employer, the employee need not actually make a report to anyone, but can simply refrain from acting and still be protected by CEPA." *Stapleton*, 931 F. Supp. 2d at 638 (internal quotation marks and citation omitted). Thus, to state a CEPA claim under Section 34:19-3c, a plaintiff must allege that he: (1) "reasonably believed" that his "employer's conduct was violating either a law, rule, or regulation . . . , or a clear mandate of public policy"; (2) objected to, or refused to participate in his employer's conduct; (3) "an adverse employment action was taken against him . . ."; and (4) "a causal connection exists between the [objection or refusal] and the adverse employment action." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003) (citations omitted).

8

There is no requirement "that the activity complained of . . . be an actual violation of a law or regulation, only that the employee 'reasonably believes' that to be the case." *Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 545 (N.J. 2000). "[T]he offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee." *Mehlman v. Mobil Oil Corp.*, 153 A.2d 1000, 1013 (N.J. 1998).

Here, Plaintiff has sufficiently pled all elements of a CEPA claim. First, Plaintiff alleges that he believed Defendants' conduct—instructing Plaintiff to return to work—violated a law, rule, regulation or clear mandate of public policy in part because the Hamilton DOH instructed him to quarantine for two weeks due to his COVID-19 exposure. (Compl. ¶¶ 28–34.) The record contains the Hamilton DOH Quarantine Order that indicates Plaintiff was under quarantine instructions during the time Defendants instructed him to report to work. (DOH Quarantine Order *16–17 (placing Plaintiff in quarantine from April 2 to April 16, 2020); Compl. ¶¶ 31, 33 (alleging Defendants directed Plaintiff to return to work in or about April 6 and April 13, 2020).)

Notably, Defendants fail to address both the Complaint's assertions that the Hamilton DOH instructed Plaintiff to quarantine and the Hamilton DOH Quarantine Order. (*See* Defs.' Moving Br. 7–14; Defs'. Reply Br. 2–7, ECF No. 7.) Instead, Defendants point to excerpts of general guidance issued by the NJDOH that permitted employers to allow asymptomatic employees to report to work under certain conditions. (Defs.' Moving Br. 8–10.) The cited guidance, however, is inapposite because, like Defendants, the guidance does not address the situation where an employee is expressly instructed to quarantine by a health agency. And to the extent Defendants attempt to argue that Plaintiff's return to work may not have been considered "dangerous to the public health, safety, or welfare" (Defs.' Moving Br. 7–8), the Court disagrees. COVID-19 is a highly contagious respiratory virus that has resulted in a global pandemic, infecting over

27,000,000 million people and claiming approximately 500,000 lives in the United States. *See* Center for Disease Control & Prevention, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home, (last visited Feb. 23, 2021).

As to the second element of a CEPA claim, Plaintiff alleges that he refused to return to work based on the Hamilton DOH's quarantine instructions. (Compl. ¶¶ 30–34.) Third, Plaintiff alleges that Defendants terminated his employment for refusing to return to work despite advising them of the quarantine instructions. (*See id.* ¶¶ 6, 30, 34.) Finally, Plaintiff alleges that Defendants terminated his employment notwithstanding the Hamilton DOH's quarantine order. (*See id.* ¶¶ 30–34.) On these facts, the Court finds that Plaintiff has stated a plausible claim for relief under CEPA. The Court, accordingly, denies Defendants' Motion to Dismiss Plaintiff's CEPA claim.[5]

### D. Count Six: FFCRA

Defendants argue that Count Six should be dismissed because under the definition of "health care provider" applicable at the time of Plaintiff's employment termination, Plaintiff was exempt from the FFCRA's paid-leave benefits. (Defs.' Moving Br. 17–18.)

In response to the unfolding COVID-19 pandemic, Congress passed the FFCRA which, *inter alia*, requires covered employers to provide employees with paid sick leave for one or more

---

[5] Count Four asserts a claim for wrongful discharge in violation of public policy. (Compl. ¶ 53.) Defendants argue that Plaintiff's wrongful discharge claim "should be dismissed for the same reasons as his CEPA claim." (Defs.' Moving Br. 15.) Having already concluded otherwise, the Court denies Defendants' Motion to Dismiss Count Four. The Court notes, however, that CEPA contains a waiver provision that states: "the institution of an action in accordance with [CEPA] shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation under the common law." N.J. Stat. Ann. § 34:19-8. Courts have found that the waiver provision does not attach until after the completion of discovery. *See Curro v. HD Supply, Inc.*, No. 19-19198, 2020 WL 3496955, at *6 (D.N.J. June 29, 2020) (observing a circuit split on this issue). Here, the Court will tentatively permit Plaintiff's wrongful termination claim to proceed. Upon the completion of discovery, Plaintiff will have to elect between his CEPA claim and wrongful discharge claim.

10

of six COVID-19-related reasons provided in the Emergency Paid Sick Leave Act ("EPSLA"). FFCRA, Pub. L. No. 116-127, 134 Stat. 178, (Mar. 18, 2020).[6] Under the FFCRA, employers are prohibited from "discharg[ing], disciplin[ing], or in any other manner discriminat[ing] against any employee who . . . takes leave in accordance with the Act." *Id.* § 5104(1).

The FFCRA provides that the term "health care provider" has the same meaning as the term provided in Section 101 of the FMLA. *Id.* § 5110(4). Under the FMLA, a health care provider is defined as: "(A) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or (B) any other person determined by the Secretary to be capable of providing health care services." 29 U.S.C. § 2611(6).

Shortly after Congress enacted the FFCRA, the DOL promulgated a Temporary Rule implementing the FFCRA's provisions. *See* 85 Fed. Reg. 19326 (Apr. 6, 2020). Under the Temporary Rule, "an [e]mployer whose [e]mployee is a health care provider . . . may exclude such [e]mployee from the EPSLA's Paid Sick Leave requirements." *Id.* § 826.30(c). The Temporary Rule defined a "health care provider" as:

> anyone employed at any doctor's office, hospital, health care center, clinic, post-secondary educational institution offering health care instruction, medical school, local health department or agency, *nursing facility*, retirement facility, *nursing home*, home health care provider, any facility that performs laboratory or medical testing, pharmacy, or any similar institution, [e]mployer, or entity. This includes any permanent or temporary institution, facility, location, or site where medical services are provided that are similar to such institutions.

---

[6] Those reasons include circumstances where the employee: (1) " is subject to a Federal, State, or local quarantine or isolation order related to COVID-19"; (2) "has been advised by a health care provider to self-quarantine due to concerns related to COVID-19"; (3) "is experiencing symptoms of COVID-19 and [is] seeking a medical diagnosis"; (4) "is caring for an individual who is subject to an order as described in subparagraph (1) or has been advised as described in paragraph (2)"; (5) "is caring for a son or daughter of such employee if . . . the child care provider of such son or daughter is unavailable, due to COVID-19 precautions"; and (6) is experiencing any other substantially similar condition specified by the Secretary of Health and Human Services in consultation with the Secretary of the Treasury and the Secretary of Labor." *Id.* § 5102(a)(1)-(6).

11

*Id.* § 826.30(c)(1)(i) (emphasis added). Thus, as Defendants assert in their Moving Brief, the Temporary Rule permitted Defendants to exclude Plaintiff from the FFCRA's paid-leave benefits because Plaintiff fell within the Temporary Rule's broad definition of a "health care provider." (Defs.' Moving Br. 17–18.)

After the parties fully briefed this Motion, the Southern District of New York issued a decision vacating certain provisions of the DOL's Temporary Rule, including the rule's definition of a "health care provider." *New York v. U.S. Dep't of Labor*, 477 F. Supp. 3d 1, 18 (S.D.N.Y 2020). In reaching its decision, the court found the DOL exceeded its authority by issuing a "vastly overbroad" definition of "health care provider" that was inconsistent with the FFCRA's "unambiguous terms." *Id.* at 14–15. The court noted the FFCRA "requires that the Secretary determine that the *employee* be capable of furnishing healthcare services." *Id.* at 14. "The DOL's definition, however, hinges entirely on the identity of the *employer*, in that it applies to anyone employed at or by certain classes of employers, rather than the skills, role, duties, or capabilities of a class of employees." *Id.* at 14–15.

In response to the district court's ruling, the DOL issued a Revised Rule that narrowed the definition of "health care provider" to employees capable of providing "diagnostic services, preventive services, treatment services, or other services that are integrated with and necessary to the provision of patient care," or who otherwise meet the definition of the term provided under the FMLA. 85 Fed. Reg. 57677-01, 57,690 (Sept. 16, 2020); 20 C.F.R. § 826.30(c)(1). The Revised Rule went into effect on September 16, 2020. *See id.*

In light of the DOL's Revised Rule, Plaintiff filed a Supplemental Brief arguing that Defendants' Motion to Dismiss the FFCRA claim should be denied because he is not considered

a health care provider. (Pl.'s Suppl. Br. *1–2, ECF No. 10.) In opposition, Defendants argue that the Revised Rule cannot be applied retroactively. (Defs.' Suppl. Br. *1–3, ECF No. 11.)

After review, the Court finds that the Temporary Rule's vacated provision defining "health care provider" does not apply to the parties in this matter. The Court agrees that the Revised Rule does not apply retroactively but the inquiry does not end there.[7] Under the Administrative Procedure Act ("APA"), a federal court is authorized "to 'set aside' unlawful agency action, such as the agency's promulgation of a rule that . . . exceeds the agency's authority or limitations under a statute, or that is otherwise not in accordance with the law." *Kinkead v. Humana, Inc.*, 206 F. Supp. 3d 751, 753–54 (D. Conn. 2016) (citing 5 U.S.C. § 706(2)(A), (C)). "When a court vacates an agency's rule, such a vacatur restores the status quo before the invalid rule took effect, and the agency must initiate another rulemaking proceeding if it would seek to confront the problem anew." *Id.* at 754 (citations omitted).

Here, the Southern District of New York vacated the Temporary Rule's provision defining "health care provider," finding that the DOL exceeded its authority by promulgating a "vastly overbroad" definition that was contrary to the FFCRA's "unambiguous terms." *New York*, 477 F. Supp. at 1. The court's vacatur had the effect of restoring the status quo before the vacated Temporary Rule provision took effect. *Kinkead*, 206 F. Supp. 3d at 754. The applicable definition of "health care provider" in this case is therefore the definition provided by the FFCRA—the applicable law at the time of Plaintiff's employment termination. Thus, that the Revised Rule does not apply retroactively does not lead to the conclusion that the vacated rule remains applicable

---

[7] "[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Here, the Revised Rule does not expressly state that it has retroactive effect. *See* 85 Fed. Reg. 57677-01.

13

during the relevant time period. Another district court recently reached a similar conclusion in a factually similar case. *See Payne v. Woods Servs., Inc.*, No. 20-4651, 2021 WL 603725, at *5 (E.D. Pa. Feb. 16, 2021) ("That the [Temporary] Rule was in place at the time of Plaintiff's firing is irrelevant when the Rule itself was not lawfully promulgated" and "because the [Revised] Rule was not yet in effect at the time of Plaintiff's firing, and it does not have retroactive application, the definition in the FFCRA itself is the one that the [c]ourt should apply."). Defendants do not dispute that under the FFCRA's definition of a health care provider, Plaintiff is not exempt from the FFCRA's paid-leave benefits. The Court, accordingly, denies Defendants' Motion to Dismiss Plaintiff's FFCRA claim.[8]

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted as to Counts One and Seven, and denied as to Counts Two, Three, Four, and Six.[9] The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[8] The Court is in receipt of the parties' correspondence addressing the Eastern District of Pennsylvania's decision in *Payne*. (ECF Nos. 12, 13.) Notwithstanding Defendants' disagreement with *Payne*, the Court reaches the same conclusion.

[9] The final count at issue in this Motion, Count Seven, sets forth Plaintiff's requested relief. (Compl. ¶¶ 59–66.) "[C]ourt's within the Third Circuit[, however,] routinely dismiss stand-alone counts for declaratory and injunctive relief, since such claims are requests for remedies, and not independent causes of action." *ASAH v. N.J. Dep't of Educ.*, 330 F. Supp. 3d 975, 1019 n.25 (D.N.J. 2018) (collecting cases). "Plaintiff concedes the dismissal of Count Seven of the Complaint." (Pl.'s Opp'n Br. 14.) The Court, accordingly, grants Defendants' Motion to Dismiss Count Seven.